# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

## 18-293

JOSEPH STELLY

VERSUS

NATIONAL UNION FIRE INSURANCE COMPANY, ET AL.

**********

APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF IBERIA, NO. 122902
HONORABLE GREGORY P. AUCOIN, DISTRICT JUDGE

**********

## ULYSSES GENE THIBODEAUX
## CHIEF JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Shannon J. Gremillion, and Candyce G. Perret, Judges.

**GREMILLION, J., concurs and assigns reasons.**

**PERRET, J., concurs and assigns reasons.**

REVERSED.

André F. Toce
The Toce Firm, APLC
969 Coolidge Boulevard
Lafayette, LA 70503
Telephone: (337) 233-6818
COUNSEL FOR:
  Plaintiff/Appellant – Joseph Stelly Jr.

Christopher Shannon Hardy
Penny & Hardy
600 Jefferson Street – Suite 601
Lafayette, LA 70502
Telephone: (337) 231-1955
COUNSEL FOR:
  Defendant/Appellee – Allstate Property and Casualty Insurance Company

**Michael J. Remondet, Jr.**
**Jeansonne & Remondet**
**P.O Box 91530**
**Lafayette, LA 70509**
**Telephone:  (337) 237-4370**
**COUNSEL FOR:**
 **Defendant/Appellee – Cecila Auto Glass, LLC**

**Bryan J. Haydel**
**Porteous, Hainkel & Johnson**
**343 Third Street – Suite 202**
**Baton Rouge, LA 70801-1309**
**Telephone:  (225) 383-8900**
**COUNSEL FOR:**
 **Defendant/Appellee – Allstate Property and Casualty Insurance Company**

**Joshua K. Trahan**
**Juneau David, APLC**
**P. O. Drawer 51268**
**Lafayette, LA 70505-1268**
**Telephone:  (337) 269-0052**
**COUNSEL FOR:**
 **Defendants/Appellees – National Union Fire Insurance Company, Lexington Insurance Company, Emanual J. Benoit, Brent C. Singleton, & American Eagle Logistics, LLC**

**Jerome H. Moroux**
**Broussard & David, LLC**
**P. O. Box 3524**
**Lafayette, LA 70502-3524**
**Telephone:  (337) 233-2323**
**COUNSEL FOR:**
 **Plaintiff/Appellant – Joseph Stelly Jr.**

**THIBODEAUX, Chief Judge.**

Plaintiff Joseph Stelly Jr. appeals the summary judgment dismissing his claims against Defendants National Union Fire Insurance Company, Lexington Insurance Company, Emanuel J. Benoit, Brent C. Singleton, and American Eagle Logistics, LLC (Defendants) on the issue of causation. Mr. Stelly was injured as a result of a rear-end collision between Mark Maras and Emanuel Benoit, after which Mr. Maras's vehicle spun into the lane in which Mr. Stelly was traveling as a guest passenger. The trial court found that the evidence presented of Defendants' negligence was insufficient to overcome the rebuttable presumption of Mr. Maras's liability as a following motorist and granted Defendants' joint Motion for Summary Judgment, thereby dismissing Mr. Stelly's personal injury claims against them.

On appeal, Mr. Stelly seeks reversal of the summary judgment and the opportunity to prove comparative fault on the part of Defendants, asserting that a disputed factual issue remains as to whether Mr. Maras's negligence was the sole cause of the accident. Mr. Stelly contends that, pursuant to the sudden emergency doctrine, the evidence presents factual questions regarding whether Defendants negligently created a hazard that a following motorist could not reasonably avoid. Mr. Stelly also alleges that Defendants' negligence in hiring, supervising, and retaining Mr. Benoit as a driver-employee contributed to the accident.

After conducting a de novo review of the evidence, we find that genuine issues of material fact preclude summary judgment. We reverse the judgment of the trial court and remand the case for further proceedings consistent with this opinion.

Mr. Stelly has additionally filed a Motion to Strike the Original Brief of a later-added defendant, Cecilia Auto and Glass, alleging that it lacks standing to

file an appellate brief in this matter because the judgment was not final as to Cecilia. For the reasons that follow, we disagree. Defendants also argue in their Original Appellee Brief that the Accident Reconstruction Report prepared by Mr. Stelly's expert, Michael Gillen, should be "stricken and disregarded" by this court because it is "unnecessary and unreliable" under La.Code Evid. art. 702. We decline to do so for the reasons set forth below.

I.

## ISSUES

We must decide:

(1)    whether the trial court erred in granting Defendants' Motion for Summary Judgment;

(2)    whether this court may strike Cecilia Auto and Glass's appellate brief written in support of Defendants' grant of summary judgment; and

(3)    whether this court may strike and disregard Plaintiff's expert report.

II.

## FACTS AND PROCEDURAL HISTORY

On July 20, 2012, Joseph Stelly Jr. was involved in an automobile collision near the juncture of U.S. Highway 90 and Captain Cade Road in Iberia Parish. Highway 90 is a four-lane highway providing two lanes each for eastbound and westbound traffic, divided by a grassy center median, with a posted speed limit of 55 miles per hour. Captain Cade Road runs southbound and perpendicular to Highway 90. Although the road is visible from the highway, there is no intersection providing motorists direct access to the road from the highway. The only means of legally accessing Captain Cade Road from Highway 90 East requires motorists to

2

continue three-quarters of a mile east past this juncture, take the exit ramp off of Highway 90 onto L.A. Highway 88, and then backtrack onto a service road which eventually becomes Captain Cade Road. Located at this juncture is a convenience store, Food-N-Fun; one side of its parking lot borders the right-hand lane of Highway 90 East, while the other side borders Captain Cade Road.

The accident occurred at approximately 5:34 a.m. The sun had not yet risen, but the weather was clear and the roads were dry. Mr. Stelly was riding as a guest passenger in a Chevrolet Silverado hauling a boat and trailer driven by Joseph "Bobby" Belaire, traveling eastbound in the left-hand lane of Highway 90. In the right-hand lane, Emanuel J. Benoit was traveling eastbound in a Peterbilt eighteen-wheel tractor hauling a black, empty flatbed utility trailer owned by Brent C. Singleton, while in the course and scope of his employment with American Eagle Logistics, LLC. Approaching from the rear, a Hyundai Sonata driven by Mark Maras followed Mr. Benoit's tractor-trailer in the right-hand lane. On his way to pick up a shipment on Captain Cade Road, Mr. Benoit prepared to make a right turn off of the highway by slowing his vehicle and allegedly activating his right turning signal. Rather than properly using the exit ramp onto Highway 88, Mr. Benoit instead reduced his speed on the highway to an estimated speed of ten to twenty miles per hour, turned off the highway, and continued directly through the Food-N-Fun parking lot onto Captain Cade Road. For reasons unknown, Mr. Maras suddenly became aware of the turning vehicle ahead and attempted to avoid a collision by switching lanes ahead of Mr. Belaire's pickup truck in the left lane. In doing so, however, the front right corner of Mr. Maras's car clipped the left rear corner of the tractor-trailer, sending the car spinning clockwise into the path of Mr. Belaire's pickup truck traveling in the left lane, which thereafter struck the passenger side of

3

Mr. Maras's car broadside. The impact caused a blowout of Mr. Belaire's right tire, which resulted in the pickup truck crossing the median and detaching from its trailer containing the fishing boat. Following an investigation of the accident, Mr. Benoit was issued a traffic citation for illegally cutting through a private lot in violation of La.R.S. 32:101(C), for which he pled guilty and paid the fine. Mr. Maras was also issued a traffic citation for careless operation in violation of La.R.S. 32:58.

Mr. Stelly initially filed suit seeking damages against Mr. Benoit, American Eagle Logistics, LLC, National Union Fire Insurance Company, Lexington Insurance Company, and Brent C. Singleton (hereinafter, "Defendants"). In his petition, Mr. Stelly alleged that "Maras was unable to timely see the illegally-equipped tractor-trailer and did not have time to react to Mr. Benoit's illegal turn to cut-through [sic] the Food-N-Fun parking lot." He also alleged to have sustained severe and disabling injuries as a result of the accident that required him to undergo several surgeries.

Following preliminary discovery, Defendants filed a joint Motion for Summary Judgment before the trial court. In support of their motion, Defendants argued that the evidence presented could not establish Defendants' actions as a cause-in-fact of the accident, and thus, Mr. Maras was solely liable because Mr. Stelly could not carry his burden in rebutting the presumption of Mr. Maras's fault as a following motorist. After the motion was filed, but before it was heard, Mr. Stelly filed a Fourth Amended Petition naming additional defendants, Cecilia Auto and Glass ("Cecilia") and Allstate Property and Casualty Insurance Company. Defendants' Motion for Summary Judgment was not amended to include either additional defendant.

4

The trial court granted the Motion for Summary Judgment and dismissed Mr. Stelly's personal injury claims against Defendants. It concluded that Mr. Stelly failed to present evidence sufficient to overcome the presumption of Mr. Maras's sole liability for the accident.

In challenging this presumption on appeal, Mr. Stelly contends that the trial court erred in granting summary judgment where several genuine issues of material fact remain as to whether Mr. Maras should be held solely liable for the accident. Invoking the sudden emergency doctrine, he specifically asserts that evidence of Mr. Benoit's receipt of a traffic citation for illegally cutting through a private lot and Defendants' failure to maintain required conspicuity devices on the tractor-trailer, when taken together, present factual questions regarding whether Defendants could have negligently created a hazard that Mr. Maras could not reasonably avoid.

## III.

## SUMMARY JUDGMENT

### Standard of Review

An appellate court reviews summary judgments de novo, applying the same criteria that govern the trial court's determination of whether summary judgment is appropriate. *Schroeder v. Bd. of Supervisors of La. State Univ.*, 591 So.2d 342 (La.1991).

The mover bears the burden of proving that he is entitled to summary judgment. La.Code Civ.P. art. 966(D)(1). However, if the mover will not bear the burden of proof at trial on the subject matter of the motion, he need only demonstrate the absence of factual support for one or more essential elements of his opponent's

claim, action, or defense. *Id*. Thereafter, the non-moving party must "produce factual support *sufficient to establish the existence of a genuine issue of material fact or that the mover is not entitled to judgment as a matter of law.*" *Id*. (emphasis added).[1] If the non-moving party fails to produce evidence of a material factual dispute, the motion for summary judgment must be granted. *Babin v. Winn-Dixie Louisiana, Inc.*, 00-78 (La. 6/30/00), 764 So.2d 37.

Summary judgment is warranted only if the motion, memorandum, and supporting documents show that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law. La.Code Civ.P. art. 966(A)(3). Although the summary judgment procedure is favored, it is not a substitute for trial on the merits. *S.J. v. Lafayette Par. Sch. Bd.*, 06-2861 (La. 6/29/07), 959 So.2d 884. In ruling on a motion for summary judgment, the trial court's role is not to evaluate the weight of the evidence, but instead to determine whether there is a genuine issue of triable fact. *Hines v. Garrett*, 04-806 (La. 6/25/04), 876 So.2d 764. The trial court must construe factual inferences reasonably drawn from the evidence in favor

---

[1]In its written reasons for judgment, the trial court concluded "that there is insufficient evidence to overcome the presumption of fault by Maris [sic] as the sole cause of the rear-end accident." We note that the trial court's conclusion mischaracterizes the application of La.Code Civ.P. art. 966(D)(1).

Once the moving party has satisfied his initial burden, the non-moving party's burden becomes not to persuade the court that he will wholly prevail on the merits, but only to produce factual support demonstrating that a genuine issue exists which precludes a summary disposition of his cause of action. At the summary judgment stage, it is the moving party that bears the ultimate burden of persuading the court that it is more probable than not that he is entitled to judgment in his favor as a matter of law. David W. Robertson, *Summary Judgment and Burden of Proof*, 45 La. B.J. 331 (1997). "[T]he opposing party is not entitled to have the motion denied on the mere hope that at trial he will be able to discredit movant's evidence; he must, at the hearing, be able to point out to the court something indicating the existence of a triable issue of material fact." *American Bank v. Saxena*, 553 So.2d 836, 845-46 (La.1989).

Therefore, to hold that Mr. Stelly failed to present evidence sufficient to *overcome* the presumption of Mr. Maras's fault, the fact of which he will ultimately have to establish at trial, unduly imposes upon him the onerous burdens of a full-blown trial proceeding where the summary judgment procedure does not mandate such.

6

of the party opposing the motion, and all doubt must be resolved in his favor. *Stroder v. Hilcorp Energy Co.*, 17-1086, (La.App. 3 Cir. 4/4/18), 242 So.3d 1240. Stated another way, "[i]f . . . there is any evidence in the record from any source from which a reasonable inference in the [nonmoving party's] favor may be drawn, the moving party simply cannot obtain a summary judgment[.]" *Hines*, 876 So.2d at 767 (alterations in original) (quoting *In re: Japanese Electronic Products Antitrust Litigation*, 723 F.2d 238, 258 (1983), *rev'd on other grounds sub nom. Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348 (1986)).

## Law and Discussion

While acknowledging the legal presumption of Mr. Maras's liability as a following motorist, Mr. Stelly argues that the evidence establishes several genuine issues of material fact as to whether Defendants could have negligently created a hazard that Mr. Maras could not reasonably avoid, which would sufficiently rebut the presumption pursuant to the sudden emergency doctrine. Specifically, he asserts that a factual dispute exists as to whether a sudden emergency was created by Mr. Benoit's unnecessary slowing down on a high-speed highway in order to illegally cut through a parking lot in violation of La.R.S. 32:101(C), coupled with evidence of Defendants' violations of mandatory federal and state safety regulations requiring adequate conspicuity devices.

As stated above, this court must undertake an independent review of the record to determine whether genuine issues of material fact remain in this matter and whether Defendants are entitled to summary judgment as a matter of law. "A genuine issue is one as to which reasonable persons could disagree; if reasonable persons could reach only one conclusion, there is no need for trial on that issue and

summary judgment is appropriate." *Jackson v. City of New Orleans*, 12-2742, pp. 5-6 (La. 1/28/14), 144 So.3d 876, 882. Material facts are those that potentially ensure or preclude recovery, affect a litigant's success, or determine the outcome of a legal dispute. *Id*. Because it is "substantive law that determines materiality, whether a particular fact in dispute is 'material' for summary judgment purposes can be seen only in light of the substantive law applicable to the case." *Id*.

The Louisiana Supreme Court has applied the following duty-risk analysis in negligence cases to determine whether liability exists under the facts of a particular case:

> Under this analysis, a plaintiff must prove five separate elements: (1) the defendant had a duty to conform his or her conduct to a specific standard of care; (2) the defendant failed to conform his or her conduct to the appropriate standard of care; (3) the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries; (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries; and (5) actual damages.

*Brewer v. J.B. Hunt Transport, Inc.*, 09-1408, 09-1428, p. 14 (La. 3/16/10), 35 So.3d 230, 240.

Whether a duty is owed is a question of law; whether a defendant has breached a duty owed is a question of fact. *Rando v. Anco Insulations, Inc.*, 08-1163, 08-1169, (La. 5/22/09), 16 So.3d 1065. The duty owed by a following motorist is set forth in La.R.S. 32:81(A), which provides that "[t]he driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicle and the traffic upon and the condition of the highway." Thus, a following motorist who strikes the rear-end of a leading vehicle

8

is presumed to have breached this statutory duty. *Mart v. Hill*, 505 So.2d 120 (La.1987).[2]

While this court has held that "[a] motion for summary judgment can be granted on the presumption that a following motorist who strikes a leading motorist is negligent[,]" we also recognize that a following motorist may exonerate himself in a number of ways. *Lewis v. Old Republic Ins. Co.*, 17-456, p. 3 (La.App. 3 Cir. 8/23/17), 226 So.3d 557, 559. Generally, a following motorist may rebut the presumption "by demonstrating that he or she had his car under control, closely observed the preceding vehicle, and followed at a safe distance under the circumstances[.]" *Leblanc v. Bouzon,* 14-1041, p. 4 (La.App. 3 Cir. 3/4/15), 159 So.3d 1144, 1146 (quoting *Garcia v. Stalsby*, 11-350, p. 5 (La.App. 3 Cir. 12/14/11), 78 So.3d 873, 877, *writ denied*, 12-422 (La. 4/9/12), 85 So.3d 703). Alternatively, the following motorist may also avoid statutory liability through invocation of the sudden emergency doctrine, chiefly "*by proving that the driver of the preceding*

---

[2]We note here that the trial court and Defendants misstate the law as presuming *sole* liability on the part of the following motorist. This court has previously held:

> [A] legal presumption does exist that a following motorist who collides into the rear end of a leading automobile is at fault. *Matherne v. Lorraine*, 03-2369 (La.App. 1 Cir. 9/17/04), 888 So.2d 244, 246. The following motorist must exonerate himself or herself from fault before he or she can completely avoid liability. *Id*. However, notwithstanding the presumption of negligence, a favored motorist can still be assessed with comparative fault if his or her substandard conduct contributed to the cause of the accident. *Id*. "[O]nce the presumption of negligence attaches to the [following motorist], the ordinary rules of comparative negligence apply[."]

*Boyance v United Fire and Cas. Co.*, 17-876, p. 8 (La.App. 3 Cir. 3/28/18), 242 So.3d 745, 751 (quoting *Graffia v. Louisiana Farm Bureau Casualty Ins. Co.*, 08-1480, p. 7 (La.App. 1 Cir. 2/13/09), 6 So.3d 270, 274) (first, second, and fourth alterations in original), *rev'd*, 18-886 (La. 10/8/18), 253 So.3d 1274.

"The presumption does not in and of itself preclude an apportionment of fault to the lead driver where negligence can be shown." *Matherne*, 888 So.2d at 246.

*vehicle negligently created a hazard which the following motorist could not reasonably avoid.*" *Id*. (alterations in original).

As an exception to the general rule stated above, the sudden emergency doctrine is available to a person who finds himself in a position of imminent peril and does not have sufficient time to consider and weigh all of the best means available to avoid that impending danger; such a person is not guilty of negligence if he fails to adopt what subsequently and upon reflection may appear to be the better method, unless the emergency is brought about by his own negligence. *Hickman v. S. Pac. Transp. Co.*, 262 La. 102, 262 So.2d 385 (1972). However,

> [t]he sudden emergency doctrine is not limited to situations where the person claiming the benefit of the defense is the person in immediate peril. Rather, it is the unanticipated hazard which is the foundation for invoking the sudden emergency doctrine. The rationale for the doctrine is the principle that a person confronted with a sudden emergency, who does not have sufficient time to weigh and consider the best means to avoid an impending danger, should not be held to the same standard of control, care, and caution as someone who has ample opportunity to fully exercise judgment and reason.

*Whiddon v. Hutchinson*, 94-2000, p. 6 (La.App. 1 Cir. 2/23/96), 668 So.2d 1368, 1374, *writs denied*, 96-731, 96-775 (La. 5/10/96), 672 So.2d 923 (citations omitted). Therefore, by invoking the sudden emergency doctrine in defending against the presumption of Mr. Maras's sole liability, it became Mr. Stelly's burden to present facts demonstrating that a genuine issue existed not only regarding whether the following motorist was the sole cause of the accident, but specifically as to whether Mr. Maras faced an unanticipated hazard in encountering the tractor-trailer driven by Mr. Benoit, who had superior capacity in exercising judgment and reason as the favored motorist on the highway.

10

Causation is the primary issue here. In support of their joint Motion for Summary Judgment, Defendants argued that Mr. Stelly could not establish that any actions on the part of Defendants caused or contributed to the accident giving rise to his injuries.

Cause-in-fact, by definition, is a question of fact. As the Louisiana Supreme Court has explained,

> Defendant's conduct need not be the sole cause of the harm but it must be a necessary antecedent. Stated another way, if plaintiff can show that more probably than not he would not have suffered damage, absent defendant's wrongful conduct, he has carried his burden of proving cause in fact.

*Morris v. Orleans Par. Sch. Bd.*, 553 So.2d 427, 429 (La.1989) (quoting *Gibson v. Faubion Truck Lines, Inc.*, 427 So.2d 68, 71 (La.App. 4 Cir. 1983). "There can be more than one cause in fact of an accident as long as each cause bears a proximate relation to the harm that occurs and it is substantial in nature." *Vodanovich v. A.P. Green Indus., Inc.*, 03-1079, p. 3 (La.App. 4 Cir. 3/3/04), 869 So.2d 930, 932. Where multiple causes are present, "a defendant's conduct is a cause-in-fact if it is a substantial factor generating plaintiff's harm." *Rando*, 16 So.3d at 1065. The substantial factor test works well where there are multiple causes-in-fact, but the trier of fact may not be able to conclude that the accident would more probably than not have happened "but for" any one of the causes. Frank L. Maraist & Thomas C. Galligan, LOUISIANA TORT LAW, § 4-3 (1996).

As correctly noted by Mr. Stelly, the jurisprudence has held that "cause-in-fact and legal cause are generally questions for the jury. The exception is when, under the uncontested facts, reasonable minds could not differ." *Blanchard v. Mitchell*, 17-444, p. 4 (La.App. 3 Cir. 6/12/17), 233 So.3d 719, 722 (quoting

11

*Nicholson v. Calcasieu Parish Police Jury*, 96-314, p. 6 (La.App. 3 Cir. 12/11/96), 685 So.2d 507, 511), *writ denied*, 17-1372 (La. 11/6/17), 228 So.3d 738. Despite the trial court and Defendants' assertion that numerous facts are "undisputed" or "non-issue[s]," the record on appeal is rife with contested facts and inconsistent testimony, the resolution of which requires a reasonable trier of fact to weigh conflicting evidence, thus precluding the granting of summary judgment.

1.  Illegally Crossing a Private Lot

In challenging the presumption of Mr. Maras' liability for the rear-end collision, Mr. Stelly asserts that Mr. Benoit negligently created a hazard first by slowing down on a high-speed highway to illegally cut through the parking lot of the Food-N-Fun convenience store in order to access Captain Cade Road. Defendants argue that Mr. Benoit's maneuver off the highway was a "legal and proper" right turn that in no way contributed to Mr. Maras' vehicle colliding with Mr. Belaire's vehicle. Both Defendants and the trial court heavily relied on the testimony provided by Trooper Smith, who neither witnessed the accident nor was qualified as an expert on the matter. The trial court summarily dismissed Mr. Benoit's illegal maneuver as being a cause-in-fact of the accident in concluding, "Trooper Smith testified that the right-handed turn of Benoit from Hwy. 90 to the parking lot of the convenience store was properly made without interference with other lanes of travel or creating a hazard to other drivers."

During preliminary discovery, the risk management records of American Eagle Logistics, LLC ("AEL") revealed that on the morning of the accident, Mr. Benoit reported that he had overslept and was running late to pick up a shipment at Supreme Services, which is located on Captain Cade Road. Mr. Benoit

12

called the dispatcher to inform the location that he was running late, and he was later informed by another driver for AEL that Supreme Services was waiting on him. Traveling on Highway 90 East, Mr. Benoit made a right turn off the highway, and in one continuous motion, illegally traversed the Food-N-Fun convenience store parking lot in order to access Captain Cade Road. A nearby witness had to flag down Mr. Benoit to apprise him of the accident, as Mr. Benoit stated to Trooper Smith during an initial investigation of the accident that he had not felt the impact of Mr. Maras' vehicle striking the rear of the flatbed trailer, and thus was unaware of the ensuing collision following his departure from the highway. Mr. Benoit was then issued a traffic citation for cutting through a private lot in violation of La.R.S. 32:101(C), which provides, "[N]o person shall drive any vehicle through or over private property, including, but not limited to, any corner parking or driveway facility, from a highway solely for the purposes of entering another highway." Mr. Benoit pled guilty to the citation and paid the fine.

In his deposition, Mr. Benoit gave conflicting details surrounding the incident. He stated that he could not remember whether he was running late on the morning of the accident and that he did not remember either calling the dispatcher or receiving a call from his fellow AEL employee, but otherwise offered no other basis to dispute this information. Despite the fact that the objective evidence strongly suggests that both he and his employer were aware that he was late—as indicated by AEL's investigative report and the testimony of Randy Vidrine, who transcribed the report on behalf of AEL—Mr. Benoit stated that he entered the Food-N-Fun parking lot because he planned on stopping at the store to get a soft drink. When asked what made him decide not to stop, Mr. Benoit answered that he simply

13

changed his mind once in the parking lot and kept going. Following the accident, however, Trooper Smith completed an investigative report which stated:

> I then spoke to the driver of vehicle 2, the 18 wheeler[.] Driver 2 stated that he was going to the store, but continued on through the parking lot enroute [sic] to pick up his load, as the intersection of Capt. Cade Rd [sic] at US 90 had been removed by DOTD and the driver did not want to proceed to LA 88 and then backtrack on the service road.

Mr. Benoit took issue with the report and claimed that this information was "not true" and that he had not told such information to the officer. Nevertheless, Mr. Benoit continued to testify that he never once stopped his truck in the parking lot, but made one continuous maneuver off Highway 90, through the parking lot, and onto Captain Cade Road.

Mr. Benoit was familiar with the area and admitted that had he not cut through the parking lot, he would have had to go farther up the highway in order to use the ramp to exit off of Highway 90 onto Highway 88; he testified that this was the proper way to access Captain Cade Road from Highway 90. Finally, Mr. Benoit agreed that he could exit off of Highway 90 onto Highway 88 without having to slow down on Highway 90, and that the exit ramp was long enough such that he could pull his truck off the highway, onto the exit, and then begin slowing down, adding "whenever I get on the exit, I start slowing down."

In his deposition, Trooper Smith provided testimony regarding his investigation of the accident and the traffic citation he issued to Mr. Benoit. As to the maneuver itself, he maintained that because Mr. Benoit had activated his right turning signal and safely reduced his speed before turning, that his right turn into the parking lot was a legal maneuver, regardless of Mr. Benoit's intentions once in the parking lot. He classified Mr. Benoit's violation as being a "secondary violation,"

because the violation only occurred once Mr. Benoit continued driving onto Captain Cade Road. He further testified having listed Mr. Benoit's speed at the time of the accident as 20 mph purely based off of his own estimate. On the other hand, the Accident Reconstruction Report prepared by Mr. Stelly's expert, Michael Gillen, estimates that Mr. Benoit could have only safely made such a turn by reducing his speed to 10 mph. The report also states that "Mr. Benoit's failure to utilize the available highway route that was designed for safe deceleration resulted in an unnecessary reduction in his speed within the travel lane of a high volume and high speed highway at night." Further, given the length of the dedicated exit lane, the report found that Mr. Benoit could have entered the lane at the posted speed of 55 mph and gradually slowed to a turning speed of 10 mph in approximately 33 seconds without the need to apply his brakes and, in doing so, would not have interfered with traffic in the main travel lane.

While Trooper Smith admitted that if Mr. Benoit "hadn't made the cross-over onto Captain Cade, there is no violation," the following colloquy, when compared against the findings in the expert report, demonstrates not only that a reasonable fact-finder could conclude that there may be more than one "but-for" cause of the accident, but also that reasonable minds could certainly disagree as to whether Mr. Benoit's violation was a legal cause of the Mr. Stelly's damages.

> Q: But if he'd gone down to Highway 88, he wouldn't have had to turn into the private lot, correct?
>
> A: That is correct. And had the vehicle that ran into the rear of him paid attention, we wouldn't have had the crash as well.
>
> . . . .
>
> Q: Would you agree that his violation at least had something to do with the crash . . . ?

15

A: That's a legal maneuver, and if he would have crossed over that private lot, gotten on Captain Cade and then turned into the parking lot behind the store to get around to the diesel pumps which are on the west side of the store so that he could exit back out to Highway 90, he, again would not have been in violation, even though he was crossing over a parking lot.

His violation is secondary because he crossed over the parking lot and got back on a public roadway to go someplace else, and that was post-crash. I can't say that it's a violation and that it contributed to the crash because his turn was a legal maneuver.

In spite of Trooper Smith's hypothetical scenario envisioning Mr. Benoit having made a legal right turn in order to access the facilities of the convenience store, the facts of this case dictate otherwise. Not only did Mr. Benoit admittedly make one continuous motion through the parking lot, but the evidence also strongly suggests that he did not intend the store's parking lot to be his final destination. The fact that Trooper Smith relayed Mr. Benoit's remarks concerning his intended destination in the accident report narrative, for which he ultimately issued Mr. Benoit a citation for the act of crossing through the parking lot in violation of La.R.S. 32:101(C), suggests that Trooper Smith had some reason to distinguish an illegal crossing-through from a legal right turn. In reviewing the trial court's finding that Mr. Benoit's maneuver constituted a legal right turn, despite the issuance of a traffic citation for that same maneuver, neither the legislative history of the statute itself nor the jurisprudence provides any meaningful guidance on the distinction. As Mr. Stelly's argument concerns questions of fact, however, we decline to extend this discussion to resolving questions of law.

Nevertheless, we do not find that the characterization of Mr. Benoit's maneuver as a legal right turn is an "undisputed fact" as both Defendants and the trial court have stated. In light of the glaring inconsistencies between Mr. Benoit

16

and Trooper Smith's deposition testimonies regarding Mr. Benoit's maneuver, reasonable minds could certainly disagree as to whether Mr. Benoit's actions for which he was cited constituted a substantial factor in creating a sudden emergency and a cause-in-fact of Mr. Stelly's injuries. While one might reasonably agree with Defendants' assertion that Mr. Maras should have exercised greater care regardless of Mr. Benoit's intended destination, the evidence presented might reasonably lead another to conclude that had Mr. Benoit properly decelerated on the exit ramp to legally access Captain Cade Road, the need to significantly reduce his speed on the highway and thus the creation of a sudden emergency would have been effectively eliminated.

Notwithstanding the discrepancies in the record, the uncontested fact of the matter remains that Mr. Benoit was issued a traffic citation in violation of La.R.S. 32:101(C), for which he pled guilty and paid the fine. Mr. Benoit's violation of a traffic law invokes the doctrine of negligence per se, which imposes civil responsibility only if the act in violation of the statute is deemed the legal cause of damage to another. *Faucheaux v. Terrebonne Consol. Gov't*, 615 So.2d 289 (La.1993). Where legal cause is generally a question for the jury, we find that the exception is inapplicable here because reasonable minds could disagree as to whether the undisputed fact of Mr. Benoit's receipt of a traffic violation constituted a legal cause of Mr. Stelly's injuries. *See Blanchard*, 233 So.3d 719. Given the inconsistent testimony regarding Mr. Benoit's intended destination and the disputed characterization of his maneuver off of the highway, we find that reasonable minds could disagree as to whether Mr. Benoit's violation contributed, at least in part, to the accident. As such, the determination of whether to impose liability on the part

17

of Defendants most appropriately belongs to a jury rather than having been disposed of through summary judgment.

### 2. Visibility of the Tractor-Trailer

Mr. Stelly asserts that there is a genuine issue of material fact as to whether Mr. Benoit, AEL, and Mr. Singleton's failure to properly inspect, maintain, and repair federally-mandated conspicuity devices on the tractor-trailer resulted in severely reduced visibility, and thus the creation of a hazard, to following motorists such as Mr. Maras. On appeal, Defendants maintain that the visibility of the Benoit vehicle is a "non-issue" because Mr. Stelly has presented no evidence that any of Defendants' actions caused or contributed to the accident. To the contrary, Mr. Stelly has presented a wealth of information regarding the diminished visibility of the tractor-trailer, especially as to the lack of conspicuity and lighting devices on the tractor-trailer. Specifically, Mr. Stelly alleges that Defendants' failures were in violation of the Federal Motor Carrier Safety Regulations (FMCSR) and the Louisiana Administrative Code, which outlines state compliance with the FMCSR. The FMCSR provide standards specifying the requirements for lamps, reflective devices, and associated equipment that are to be equipped and properly maintained on tractors and trailers, including retroreflective sheeting and reflex reflectors. Further, La.R.S. 32:104 provides that fully functioning and clean lights should be visible from approximately 1,000 feet away.

In its written reasons for judgment, the trial court stated:

> *Although a violation of a safety statute concerning conspicuity tape have* [sic] *occurred in this case*, the alleged failure to illuminate the vehicle did not cause the accident based upon the testimony of Trooper Smith and Joseph Belaire.

18

(emphasis added).

In the Accident Reconstruction Report prepared by Mr. Stelly's expert, Michael Gillen, a comparison of photographs of the trailer taken before and after its repair following the accident revealed that "[t]he reflective tape and taillights of the trailer are in poor condition and the tractor has no reflective tape positioned on the top rear corners of the cab to provide additional conspicuity." He further found that "the tape likely provided little to no reflective quality or visibility assistance to any driver behind the trailer, including Mark Maras." As the driver-employee, Mr. Benoit did not consider it his responsibility to ensure that the trailer's conspicuity devices were up to code and testified that Mr. Singleton and AEL inspected the tractor-trailer every two months to ensure its compliance with Department of Transportation regulations. Robert Thompson, the safety manager for AEL, testified that the condition of the trailer was up to AEL's standards because it had passed its federally-mandated inspection performed by Cecilia Auto and Glass. However, Dwight Leblanc, owner of Cecilia, testified that based on the photograph of the truck, he would not have personally passed the tractor-trailer for inspection because the tape "was all messed up" and he would expect his employee "not to have passed that truck" with tape in such an insufficient condition.

Notwithstanding the testimony supporting its conclusion, the trial court ultimately conceded in its written reasons that Defendants violated a traffic safety statute, once again invoking the doctrine of negligence per se. Our supreme court has explained that "where a traffic law is designed to protect life and property, it is a safety measure, the violation of which is negligence per se and is actionable if it was a legal cause of the collision." *Eubanks v. Brasseal*, 310 So.2d 550, 553

19

(La.1975). Here, as Mr. Stelly notes, the stated purpose of the standards set forth in the FMSCR is,

> [T]o reduce traffic accidents and deaths and injuries resulting from traffic accidents, by providing adequate illumination of the roadway, and by enhancing the conspicuity of motor vehicles on the public roads so that their presence is perceived and their signals understood, both in daylight and in darkness or other conditions of reduced visibility.

Federal Motor Vehicle Safety Standards, 49 C.F.R. § 571.108, S2 (2011). Where the FMCSR are explicitly designed to protect against accidents, injuries, and death, the trial court's conclusion that Defendants' failure to ensure adequate conspicuity devices resulted in a violation necessarily presents this as a question of legal cause to be determined by the jury, unless reasonable minds could not differ as to whether this undisputed fact was a legal cause of the accident.

> The trial court also articulated the following:
>
> The undisputed facts are that Benoit, traveling on Hwy. 90 with *proper lights*, slowed his vehicle to make a legal right-hand turn into a parking lot of a convenience store. His turning indicator light was on at the time. . .
>
> Plaintiff's argument that the visibility of the Benoit vehicle is a disputed issue and that lack of visibility created a hazard on the roadway is unsupported by the evidence of cause-in-fact of the accident. *Mr. Belaire clearly saw the lights of the truck/trailer* and recognized the truck was slowing down and observed the right blinker evidencing an anticipated right turn.

(emphasis added). Though mentioning "proper lights," the trial court failed to elaborate as to which lights – tail, brake, and/or signal – were proper and functioning. The record reveals that it is not an undisputed fact that "proper lights" were on when

further considering the inconsistent and somewhat confusing testimony provided by Mr. Belaire and Trooper Smith.

In his deposition, Trooper Smith testified that Mr. Benoit reported to him on the scene that he activated his right turn signal before turning, and that Mr. Belaire confirmed seeing the right turn signal light. In the accident report, Trooper Smith also made a finding of "no defects" on the tractor-trailer in his report. However, when asked whether he inspected the turn signal after the accident to see if it was operational, Trooper Smith responded: "I don't recall if I did or not. It's not stated in the report that I did, so I can't testify that I did or did not." When further asked whether the mention of seeing a vehicle's lights in a rear-end accident would prompt him to check the signal lights, he responded, "[a] lot of the times I do. I just can't honestly say whether or not I did on this one with the time frame. I don't recall that."[3]

---

[3]In the recent decision *Lege v. FAS Services, Inc.*, 2015-1622, p. 5 (La.App. 1 Cir. 4/15/16) (unpublished opinion), the first circuit held that summary judgment was precluded where

> [D]efendants failed in their burden to demonstrate that there are no genuine issues of material fact that remain herein as to whether the rear tail lamps of the Frat Tanker were operational at the time of the accident. Indeed, the evidence offered by defendants is conflicting as to whether the rear tail lamps were properly functioning on the night of the accident[.] . . . Given defendants' failure to establish the lack of any factual support for [plaintiff's] claim that [defendant truck driver] breached his statutory duty of properly displaying lighted tail lamps on the nights of the accident, and the factual support of record for [plaintiff's] claim that [defendant] negligently created a hazard that he could not reasonably avoid, which would operate to rebut the presumption of [plaintiff's] negligence as the rear-ending motorist, we further conclude that defendants are not entitled to judgment in their favor as a matter of law[.]

The holding in *Lege* illustrates that in the instant case, where the trial court's oversight in failing to specify which of the lights were proper and functional, along with Trooper Smith's inability to say whether he checked any of the lights following the accident, may have produced a problematic and confusing conclusion that visibility in this case was a non-issue, such that a genuine issue of material fact may arise from this fact alone.

Mr. Benoit testified that he put on his right turning signal approximately one-quarter of a mile away before turning into the Food-N-Fun parking lot. Though he testified that he "slowed down," he never indicated whether he applied his brakes in doing so, from which Mr. Stelly's expert, Michael Gillen, stated that "[i]n the absence of brake lights, particularly at night, there would be little to no visual cue to alert traffic approaching from the rear of the speed reduction of Mr. Benoit's 18-wheeler with the right travel lane." Even where Gillen presented the hypothesis that Mr. Benoit could have gradually slowed his vehicle without having to apply the brakes, thus activating no visible brake lights, he found that,

> Considering looming, Mr. Maras would first become aware that he was closing on the slow moving 18-wheeler at 257 ft. to 363 ft. or less . . . Mr. Maras was forced to negotiate an evasive maneuver by Mr. Benoit's 18-wheeler blocking the travel lane and the right shoulder ahead, and was further limited by Mr. Belaire's pickup and boat trailer in the left lane.

Upon his arrival on the scene of the accident, Trooper Smith was unable to obtain statements from either Mr. Stelly or Mr. Maras, as both men were already in transit to receive medical treatment by the time he arrived. Mr. Maras was found unconscious at the scene, and later testified that he has no recollection of the accident. As a guest passenger in Mr. Belaire's pickup truck, Mr. Stelly was not paying attention to the road, and thus, could offer no meaningful testimony as to how the accident occurred. Though he was able to report to Trooper Smith on the scene that he activated his right turn signal light before turning into the parking lot, Mr. Benoit was ultimately unaware of the impact from Mr. Maras's vehicle.

The only witness, therefore, that could provide details regarding the tractor-trailer's visibility was Mr. Belaire. In his deposition, he testified that while he was traveling in the left-hand lane, he first noticed the tractor-trailer ahead of him

in the right-hand lane from a distance of "a little less than" a football field away. Though uncertain as to whether and which of the brake, tail, or signal lights he saw, as depicted in the following colloquy, he was certain that he witnessed the tractor-trailer gradually slow down because it was the closing distance between their vehicles that made Mr. Belaire notice the tractor-trailer. However, his testimony remains unclear as to whether the visibility of the lights and/or conspicuity tape was sufficient to alert him to the presence of the tractor-trailer.

> **Q:  What made you notice the 18-wheeler? Anything in particular?**
>
> **A:  No.**
>
> . . . .
>
> Q:  So you would have got closer – you would have gained a distance on the 18-wheeler, because that's how you first noticed it?
>
> A:  Right.  When I was gaining up on him, I didn't think nothing of it until I got pretty close, and then this little car come by me and tried to cut in front of me.
>
> . . . .
>
> **Q:  When you noticed the 18-wheeler, can you tell me whether or not the brake lights were on the 18-wheeler?**
>
> **A:  Yes.**
>
> Q:  He was already starting to slow down?
>
> A:  No.  I saw the lights, but I don't know if –
>
> Q:  The taillights?
>
> A:  Yes.
>
> **Q:  Did you see the brake lights on the 18-wheeler go on?**
>
> **A:  That I don't know.  I don't remember.**

23

Q: You do remember seeing taillights?

A: I remember seeing the lights.

Q: As a truck going down the roadway?

A: Right.

**Q: Do you recall seeing a turn signal on the 18-wheeler? The police officer indicated that you saw the turn signal on.**

**A: That I don't remember. That's been four years ago, man.**

. . . .

Q: I mean, were you able to see taillights?

A: Yes.

**Q: You don't remember seeing brake lights, though?**

**A: No.**

Given the uncertainty in Mr. Belaire's testimony regarding his own visibility of the tractor-trailer while traveling in the next lane over, from an entirely different vantage point from that of Mr. Maras, who has no recollection regarding his visibility of the tractor-trailer, we find that reasonable minds could certainly disagree as to whether visibility was a legal cause of the accident which resulted in Mr. Stelly's injuries. Louisiana Revised Statutes 32:104 mandates that taillights be visible from a distance of approximately 1,000 feet away. Thus, Mr. Belaire's testimony that he only saw the taillights from about 100 yards away (300 feet), in light of Gillen's expert opinion as to the substandard appearance of the condition of the taillights in the photograph and the limited distance ranging between 257 feet to 363 feet in which Mr. Maras could have reacted, further puts into dispute the visibility of the tractor-trailer.

Mr. Belaire first noticed Mr. Maras' vehicle within a "split second" of the small car passing his side in an attempt to cut in front of the pickup truck. At the time Mr. Maras's car attempted to cut in front of his pickup truck, Mr. Belaire observed a distance of about three car lengths between the front of his pickup truck and the rear of the trailer, but that this distance began to close as the tractor-trailer slowed down on the highway. He further testified, "my thinking is, when he realized he couldn't slow down – when he saw the 18-wheeler and realized he couldn't slow down, it couldn't stop, he decided there was a hole and he took it and then didn't have enough clearance." Because the accident "happened so fast," Mr. Belaire was not able to appreciate whether the small car had slowed down or sped up before colliding with the tractor-trailer. He could not say whether the tractor-trailer had begun to make its turn when the small car clipped its rear.

In ultimately concluding that genuine issues of material fact exist with respect to whether a sudden emergency was created by the actions of Defendants, we agree with the jurisprudence holding that,

> [T]he application of the sudden emergency doctrine requires factual determinations concerning whether the driver was confronted with imminent peril and whether there was sufficient time to consider and weigh the circumstances in order to take action to avoid an impending danger . . . , and by the nature of the sudden emergency doctrine, it would seem rarely appropriate on a motion for summary judgment.

*Manno v. Gutierrez*, 05-0476, p. 7 (La.App. 1 Cir. 3/29/06), 934 So.2d 112, 117-18. In relying on the above language, the first circuit has reversed motions for summary judgment based upon the sudden emergency doctrine where "there was **conflicting deposition testimony** regarding the [following motorist's] opportunity and time to assess the situation and take other **evasive action**." *Carias v. Loren*, 14-0655, p. 4

25

(La.App. 1 Cir. 3/9/15) (unpublished opinion), (emphasis in original), *writ denied*, 15-870 (La. 8/28/15), 176 So.3d 402.

Among others, Defendants cite as an "undisputed fact" that "[i]nstead of slowing down, Maras kept speeding forward and unsuccessfully attempted to pull in front of the Stelly Vehicle by switching into the left hand lane." As the only witness to the accident itself, Mr. Belaire's testimony puts such a fact in dispute. Though Mr. Belaire testified that he did not see Mr. Maras's car slow down, this unknown fact of whether Mr. Maras actually sped up, as well as many others, presents conflicting evidence regarding Mr. Maras's opportunity and time to assess the situation and his ability to undertake other evasive action, the resolution of which requires the fact-finder to weigh such evidence, which is inappropriate at the summary judgment stage.

IV.

**MOTIONS TO STRIKE**

**Appellant's Motion to Strike Cecilia's Original Brief**

On June 29, 2017, Defendants filed their joint Motion for Summary Judgment in the trial court. Thereafter on July 26, 2017, Mr. Stelly filed his Fourth Amended Petition naming Cecilia Auto and Glass (Cecilia) and Allstate Property and Casualty Insurance as additional defendants. Mr. Stelly specifically alleged that Cecilia should be held liable as a joint tortfeasor with Defendants as the entity that conducted and passed an inspection of the tractor and trailer two months prior to the accident, in violation of the standards outlined in the FMCSR and Title 55 of the Louisiana Administrative Code. Defendants' Motion for Summary Judgment was

26

never amended to include the additional defendants, and on October 10, 2017, the motion was granted only in favor of the originally-named Defendants.

On appeal, Mr. Stelly filed a Motion to Strike defendant Cecilia's "Original Brief" in support of the granting of the Motion for Summary Judgment. He argues that while the trial court's judgment constitutes a final, immediately appealable judgment as to Defendants, it lacks the necessary decretal language to be considered a final judgment as to Cecilia, which neither filed a motion for summary judgment in the trial court nor was named in the judgment. Therefore, Mr. Stelly contends that Cecilia lacks standing to file an appellate brief in support of the trial court's judgment where an appellate court is vested with jurisdiction to consider final, and thus appealable, judgments. In response, Cecilia acknowledged that while it was not a party to the Motion for Summary Judgment, it is not asking this court for any relief on its own behalf. Cecilia further avers it has standing to file a brief merely supporting its co-defendants' position, given that it has a genuine interest in the outcome of the instant appeal as the ruling of this court, specifically regarding the visibility of the tractor-trailer, could have a preclusive effect on the claims and defenses asserted between it and Mr. Stelly in the lower court.

A judgment that dismisses the suit as to less than all of the defendants without adjudicating all of the issues in a case is a partial final judgment and immediately appealable without the necessity of the trial court's designation. La.Code Civ. P. arts. 1915(A)(1) and 2083. While we agree that the trial court's judgment dismissing Defendants was final and appealable as to Defendants, we disagree with Mr. Stelly's contention that this court is without jurisdiction to consider Cecilia's brief. In its response brief, Cecilia cites La.Code Civ.P. art. 2086,

which states that "[a] person who could have intervened in the trial court may appeal, whether or not any other appeal has been taken." Further,

> A party to a suit is given an unqualified right to appeal from an adverse final judgment and need not allege and show a direct pecuniary interest in order to be entitled to appeal. A person need not have a judgment directly against him in order to appeal that judgment.

*Delanzo v. ABC Corp.*, 572 So.2d 648, 650 (La.App. 5 Cir. 1990) (citations omitted) (quoting *Andrade v. Shiers*, 516 So.2d 1192, 1193 (La.App. 2 Cir. 1987)). Where one may exercise the right to appeal merely by virtue of their ability to have intervened in the trial court, reasoning *a fortiori*, we find that Cecilia, a named party to the suit which is subject to the instant appeal, certainly has a justiciable right to participate in this appeal.

## Appellees' Argument to "Strike and Disregard" Appellant's Expert Report

Defendants argue that the Accident Reconstruction Report prepared by Mr. Stelly's expert, Michael Gillen, should be "stricken and disregarded" by this court as it is both "unnecessary and unreliable" under the principles established by La.Code Evid. art. 702. Specifically, Defendants assert that Mr. Gillen's findings were not necessary to assist the trier of fact beyond common knowledge, as "[t]his accident involves a situation which is all too familiar." They also contend that Mr. Gillen's opinions were unreliable in that they were based on pure speculation, given that there is no evidence of Mr. Maras's movements before impact.

The record indicates that Defendants presented the same argument before the trial court in a timely-filed reply memorandum supporting their Motion for Summary Judgment. Despite explicitly ruling in favor of Defendants "based upon the testimony of Trooper Smith and Mr. Belaire," the trial court nevertheless

28

acknowledged the findings of the expert report in its written reasons for granting

Defendants' Motion for Summary Judgment:

> Plaintiff also submitted the Accident Reconstruction Report by National Collision Technologies, Inc. prepared by Michael S. Gillen. That report concludes that Mr. Maras could not have avoided the collision because deficient conspicuity tape on the truck/trailer prevented Mr. Maras from safely avoiding the accident and that Mr. Benoit failed to utilize a safer highway route available to him to reach Captain Cade Road and he failed to consider potential hazards created by his unnecessary reduction of speed within the high-speed travel lane of Hwy. 90, failed to periodically check for surrounding traffic, was unaware of the collision, and failed to check and ensure that lighting and reflective tape on the truck/trailer was properly maintained and effective.

In challenging Mr. Gillen's expert report, Defendants invoke La.Code Evid. art. 702, which governs the admissibility of expert testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (1)  The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (2)  The testimony is based on sufficient facts or data;
> (3)  The testimony is the product of reliable principles and methods; and
> (4)  The expert has reliably applied the principles and methods to the facts of the case.

Louisiana courts recognize that La.Code Evid. art. 702 codifies the Supreme Court's holding in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786 (1993), in which the Court reasoned that trial courts perform a necessary gate-keeping function by deciding whether expert testimony is relevant and reliable. *See State v. Foret*, 628 So.2d 1116 (La. 1993).

> At the summary judgment stage, the *Daubert-Foret* standard should be considered by the trial judge in deciding whether to admit expert opinion evidence. *Indep. Fire Ins. Co.* [*v. Sunbeam Corp.*, 99-2181 (La. 2/29/00),] 755 So.2d []226. In performing

its gatekeeping analysis at the summary judgment stage, the court: (1) cannot make credibility determinations, (2) must "focus solely on the principles and methodology, not on the conclusions they generate," (3) "must draw inferences from the undisputed facts which are most favorable to the party opposing the motion," and (4) "should only grant a motion to strike when the evidence presented established that there is no genuine issue of material facts in dispute." *Id*. at 236 (quoting *Daubert* [509 U.S. at 595, n. 6]). Further, our supreme court has held that affidavits from experts that are not based on personal knowledge are admissible to support or defend against a motion for summary judgment if the above principles are met. *Indep. Fire Ins. Co.*, 755 So2d at 226.

*Reed v. Cowboy's Western Store and Trailer Sales Inc.*, 16-462, p. 12-13 (La.App. 3 Cir. 3/1/17), 214 So.3d 987, 996, *writ denied*, 17-59 (La. 5/19/17), 219 So.3d 1108.

Having independently reviewed the record de novo, we conclude that the Accident Reconstruction Report was properly admissible pursuant to La.Code Evid. art 702. Contrary to Defendants' argument, the expert report is not unnecessary in assisting the trier of fact. Though the trial court did not provide a detailed *Daubert* analysis of the expert testimony, its acknowledgment of the submission of the report and the conclusions reached by Mr. Gillen implicitly demonstrates the expert report's relevance to the matter. Further, Defendants' argument that the expert report is unreliable is likewise unconvincing. In rendering his opinions regarding causation, Mr. Gillen reviewed over forty pieces of evidence, including the accident report, photographs of the vehicles involved, and the deposition testimony of nine witnesses. Although Mr. Gillen was unable to physically examine the tractor-trailer following the accident, he was able to compare photographs of the tractor-trailer taken before and after the accident to conclude that the reflective tape and taillights of the trailer were in poor condition, and that the reflective tape was completely missing on the top rear corners of the cab. Mr. Gillen also conducted an examination of the accident site including photographs, a

computerized site survey, surface friction testing, and a drive-thru video. Basing his methodology and scientific principles on over twenty-five years of experience in performing formal accident reconstructions, Mr. Gillen ultimately concluded that Mr. Maras was forced to negotiate the evasive maneuver undertaken by Mr. Benoit as he illegally cut through the private lot, and that Mr. Benoit's illegal maneuver resulted in an unnecessary reduction of speed in the main lane of travel.

Despite being presented with Defendants' argument to strike and disregard the expert testimony, there is no indication that the trial court sought to exclude such testimony, nor disqualify Mr. Gillen from testifying. Accordingly, Defendants' identical argument on appeal seeking to have the expert opinion rendered by Mr. Gillen stricken and disregarded by this court is rejected.

V.

## CONCLUSION

By invoking the sudden emergency doctrine in defending against summary judgment, Mr. Stelly's burden was to present facts to the trial court demonstrating that Defendants negligently created a hazard that Mr. Maras could not reasonably avoid under the circumstances. Given the factual posture of this case, summary judgment is an inappropriate mechanism in which to resolve matters falling under this doctrine, which, by its nature, involves factual determinations to be considered by a reasonable fact finder on a case-by-case basis. We are convinced by the evidence presented that reasonable minds could disagree as to whether and in what proportions the acts and omissions of Defendants may have contributed to the accident, and thus Mr. Stelly's damages.

For the foregoing reasons, the judgment granting the Motion for Summary Judgment in favor of Defendants is reversed and remanded. Costs of this appeal are assessed to the Defendants equally.

**REVERSED.**

JOSEPH STELLY JR.

VERSUS

NATIONAL UNION FIRE INS. CO., ET AL

**GREMILLION**, Judge, concurs and assigns reasons:

I agree with the result reached in this case but disagree, in part, with its reasoning.

I agree with the majority that the alleged failure of the trailer towed by Mr. Benoit to comply with federal conspicuity requirements creates a genuine issue of material fact.

I part with my colleagues on the matter of the right-hand turn by Mr. Benoit representing a potential basis for negligence per se simply because Mr. Benoit intended to proceed through the convenience store parking lot onto Captain Cade Road. The fact that Mr. Benoit proceeded through the parking lot is of no moment to the events that immediately preceded the turn, which is when the accident occurred; the violation of statute did not take place until *after* Mr. Maras had hit the trailer. The holding that an event that occurred after an accident can be a cause-in-fact of the accident seems paradoxical. Further, I do not believe that La.R.S. 32:101(C) was intended to protect following motorists, but, rather, to protect the parking lot owner from unnecessary wear and tear on his property from impatient motorists.

STATE OF LOUISIANA

COURT OF APPEAL, THIRD CIRCUIT

18-293

JOSEPH STELLY JR.

VERSUS

NATIONAL UNION FIRE INS. CO., ET AL

**PERRET,** Judge, concurs and assigns reasons:

I agree with the result reached by the majority, that there are genuine issues of material fact not suitable for resolution through summary judgment; specifically, that the alleged failure of the trailer towed by Mr. Benoit to comply with federal conspicuity requirements creates a genuine issue of material fact.

I agree with Judge Gremillion on the matter of the right-hand turn by Mr. Benoit, which does not represent a potential basis for negligence per se simply because Mr. Benoit intended to proceed through the convenience store parking lot onto Captain Cade Road. Further, I do not believe that La.R.S. 32:101(C) was intended to protect following motorists, but, rather to protect the parking lot owner from unnecessary wear and tear on his property from impatient motorists."